UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNIQUE SPORTS PRODUCTS, INC.,

        Plaintiff,

      v.

BABOLAT VS; BABOLAT VS NORTH
AMERICA, INC.; and ROCKY
MOUNTAIN SPORTS, INC. OF
BOULDER, USA,

        Defendants.

CIVIL ACTION

NO. 1:02-CV-2947-CAP

O R D E R

This matter is before the court on the defendants' renewed motion for summary judgment [Doc. No. 72], and the plaintiff's renewed motion for partial summary judgment [Doc. No. 73].

Factual Background

The following facts are undisputed, unless otherwise noted. This case arises out of a trademark dispute between rival manufacturers of overgrips for racquets. The plaintiff, Unique Sports Products, Inc., is a small, family-owned sports accessories business located in Alpharetta, Georgia. The plaintiff manufactures and sells tennis accessories to wholesalers, retailers, and consumers throughout the United States.

1

The plaintiff's flagship product is its LIGHT BLUE colored TOURNA GRIP overgrip[1], which is responsible for nearly 50% of the plaintiff's revenues.  The plaintiff's LIGHT BLUE TOURNA GRIP overgrip was invented and introduced into the market in 1977 by the plaintiff's predecessor-in-interest, Consolidated Service Group, Inc. ("Consolidated").  Consolidated selected the color LIGHT BLUE because it believed that it would differentiate Consolidated's TOURNA GRIP overgrip from the OEM and replacement racquet grips[2] then available in the market.  Since its introduction in 1977, the plaintiff's TOURNA GRIP overgrip has been continuously offered and sold in the same particular LIGHT BLUE color, which covers the entire surface of the plaintiff's

---

[1] Overgrips are strips of material that are wrapped around the handle of a tennis racquet, over the racquet's existing grip.  The purpose of overgrips is to absorb humidity and moisture from the player's hand so that the racquet does not slip, is easier to control, and has a comfortable feel.

[2] There are several types of grip products in the tennis racquet industry: (1) OEM grips, which are the original grips that come on a new tennis racquet; (2) replacement grips, which are used to replace the original tennis racquet grips completely and which attach directly to the tennis racquet handle; and (3) overgrips, which wrap over the existing tennis racquet grip.

overgrip, which in turn covers the entire handle of the sports racquet.[3]

Since its introduction, LIGHT BLUE TOURNA GRIP overgrips have been advertised in a variety of publications, including leading tennis industry magazines and trade publications, as well as local and regional tennis publications. Beginning in 1978, some of those advertisements touted the plaintiff's LIGHT BLUE TOURNA GRIP overgrips as "The Original Blue Grip" or "Blue Tape."

The plaintiff's LIGHT BLUE TOURNA GRIP overgrip was immediately successful and was sold by major sporting goods retailers, tennis and pro shops, and mail order companies. From 1977 to 1982, Consolidated spent $1,000,000 advertising its LIGHT BLUE TOURNA GRIP overgrip, and sold approximately 10,000,000 units of LIGHT BLUE TOURNA GRIP overgrip. Together from 1977 to 1998, the plaintiff and its predecessor spent more than $3,500,000 advertising their LIGHT BLUE TOURNA GRIP

---

[3] In addition to the plaintiff's LIGHT BLUE TOURNA GRIP overgrips, the plaintiff has also sold a variety of other overgrips in blue. For example, the plaintiff has offered WHATAGRIP overgrip in blue since at least as early as 1991 and SOFTGRIP overgrip in blue since at least as early as 1984. The plaintiff contends that these overgrips are offered in different shades of blue from its LIGHT BLUE mark.

overgrip and sold approximately 50,000,000 units.  Additionally, tennis legends such as Pete Sampras have used and endorsed the plaintiff's LIGHT BLUE TOURNA GRIP overgrip.  After 1992, the plaintiff's sales of TOURNA GRIP overgrips have averaged approximately $1,000,000 gross annually.

In addition to selling LIGHT BLUE TOURNA GRIP overgrips, the plaintiff also offers TOURNA GRIP overgrips in a few other colors, including gray and black.  The plaintiff, however, contends that sales of LIGHT BLUE TOURNA GRIP overgrips constitute 98.8% of all TOURNA GRIP sales.

In 1999, more than 20 years after the plaintiff, through its predecessor, first began selling LIGHT BLUE TOURNA GRIP overgrips, the plaintiff filed an application with the United States Patent and Trademark Office ("PTO") to register the LIGHT BLUE color it had been using in connection with its TOURNA GRIP overgrips.  On February 13, 2001, the PTO issued U.S. Trademark Registration No. 2,428,076 to the plaintiff for the LIGHT BLUE color for grip tapes used for sports racquets.

Additionally, in 1999, the plaintiff entered into a private labeling agreement with a third party, Head Sports AG ("Head").  Pursuant to that agreement, the plaintiff allowed Head to sell LIGHT BLUE overgrips under the HEAD brand.  The plaintiff claims

4

that sales of the HEAD brand LIGHT BLUE overgrips are minimal to the point of being inconsequential.

Defendant Babolat VS is a French corporation and one of the world's largest racquet sports companies. Babolat VS's product line includes supplies for professional tennis stringers, tennis equipment such as racquets, and grip products, including overgrips, racquet dampeners, and racquet bags.

Defendant Babolat VS North America, Inc. is Babolat VS's wholly owned subsidiary (collectively "Babolat"). Babolat VS North America, Inc. distributes BABOLAT-branded products in the United States through retail outlets, including major sporting goods chains, independently owned sporting goods shops, and tennis pro shops. Defendant Rocky Mountain Sports, Inc. of Boulder USA ("RMS") sells Babolat's tennis accessories.

Since it entered the U.S. market in the 1970s, Babolat has continuously sold overgrips in various shades of blue, including light or "powder" blues to medium or "royal" blues. For example, from the early 1980s to the late 1980s/early 1990s, Babolat served as a United States distributor for a brand of overgrips called GRIPSY.[4] The GRIPSY overgrips sold by Babolat

---

[4] The trademark rights for the GRIPSY brand of overgrips were owned by a German company called Krupper.

were offered in three colors: blue, brown, and salmon. Additionally, since 1989, Babolat has sold several types of blue overgrips throughout the United States under various brand names, including VS GRIP, SYNTEC, EASY GRIP, SYMBIO, STRIPY, and TEAM.

In 1999, Babolat introduced its PRO TEAM overgrip, which is the subject of the present suit. Babolat introduced its PRO TEAM overgrip to mimic, at least, the performance characteristics of the plaintiff's TOURNA GRIP overgrip.[5]

Babolat sells its PRO TEAM overgrip in a blue color. RMS sells blue PRO TEAM overgrips on behalf of Babolat (collectively Babolat and RMS are hereinafter referred to as "defendants"). The defendants' blue PRO TEAM overgrips are branded with Babolat's BABOLAT house mark and the PRO TEAM trademark. The defendants furnish a black finishing tape with their blue PRO TEAM overgrip, while the plaintiff furnishes a bright red finishing tape with its LIGHT BLUE TOURNA GRIP overgrip.

---

[5] In 1997, Babolat inquired with the plaintiff about a private labeling arrangement whereby Babolat would privately label the plaintiff's TOURNA GRIP overgrip. The plaintiff rejected Babolat's offer. The plaintiff argues that Babolat's attempt the privately label its trademark constitutes evidence that the defendants intentionally infringed the plaintiff's LIGHT BLUE mark.

On October 29, 2002, after sending Babolat two cease and desist letters, the plaintiff filed the instant trademark infringement action against the defendants.  In this suit, the plaintiff claims that Babolat's blue PRO TEAM overgrip infringes upon its LIGHT BLUE color trademark used in connection with its TOURNA GRIP overgrips.

<u>Legal Analysis</u>

I.   <u>The Standard for Summary Judgment</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists.  <u>See</u> <u>Adickes v. S.H.</u> <u>Kress & Co.</u>, 398 U.S. 144, 156, 90 S. Ct. 1598, 1608 (1970).  In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. <u>See</u> <u>Bradbury v. Wainwright</u>, 718 F.2d 1538, 1543 (11th Cir. 1983).  Once the moving party has adequately supported its

motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).

When deciding a summary judgment motion, the court's function is not to resolve issues of material fact, but rather to determine whether there are any such issues to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S. Ct. 2505, 2511 (1986).  The applicable substantive law will identify those facts that are material.  Id. at 248, 106 S. Ct. at 2510. Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment.  Id.

Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the non-movant.  See id.  In order for factual issues to be "genuine," they must have a real basis in the record.  See Matsushita, 475 U.S. at 586, 106 S. Ct. at 1356.  "When the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Id. (citations omitted).

8

II.  <u>The Plaintiff's Renewed Motion for Partial Summary Judgment</u>

In response to the plaintiff's complaint, the defendants primarily argue that the plaintiff's LIGHT BLUE color mark as applied to overgrips is functional and lacks secondary meaning. The defendants also argue that the plaintiff's trademark registration was procured through fraud and that the plaintiff's claims are barred by laches.  In an attempt to resolve these limited issues before trial, the plaintiff filed its renewed motion for partial summary judgment.[6]  The court construes the plaintiff's renewed motion for partial summary judgment as asking the court to issue judgment on the following issues: (1) whether the plaintiff's LIGHT BLUE color trademark for overgrips is valid, (2) whether the plaintiff's trademark registration covering its LIGHT BLUE color trademark for overgrips was procured through fraud, and (3) whether the plaintiff's claim is barred by laches.

---

[6] The parties filed their original motions for summary judgment on October 14-15, 2004 [Doc. Nos. 39 and 41].  On April 14, 2005, the court denied the parties' motions primarily because the plaintiff had failed to adequately define its trademark [Doc. No. 64].  After the plaintiff defined its trademark, the court granted the parties leave to file renewed motions for summary judgment [Doc. No. 71].

9

A.   <u>Whether the Plaintiff's LIGHT BLUE Color Mark is Valid</u>

　　1. <u>What is "LIGHT BLUE"?</u>

The plaintiff's LIGHT BLUE color mark consists of one shade of blue.  This shade of blue is exemplified by the specimen attached to the Plaintiff's Statement of Material Facts as Exhibit 1.  The plaintiff seeks to enforce its LIGHT BLUE mark against a narrow range of light blue colors representing less than 15% of the shades of blue listed on the Pantone scale.[7]  The defendants' blue PRO TEAM overgrip falls within this narrow range of light blue shades.

　　2.   <u>Whether the Plaintiff's LIGHT BLUE Trademark is Valid</u>

The plaintiff seeks summary judgment on its claim that it has a valid trademark in the color LIGHT BLUE.  Under the Lanham Act, trademarks include "any word, name, symbol, or device, or

_____

[7] The court notes that the ability of the plaintiff to enforce its mark against this narrow range of blue shades is determined by the strength of the plaintiff's mark, not by the fact that the plaintiff wants to enforce its mark against these shades.  As noted later in this order, the strength of the plaintiff's mark is determined by quite a number of factors, including the length and amount of third-party use of various shades of blue on competing overgrips.  <u>See</u> <u>Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Association</u>, 651 F.2d 311, 316 (5th Cir. 1981)(holding that extensive third-party use of the mark or a term used in the trademark weakens the strength of the mark).

any combination thereof" used by any person "to identify and distinguish his or her goods . . . ."  15 U.S.C. § 1127.  In 1995, the United States Supreme Court, resolving a split among the circuits, held that there is no per se prohibition against the use of color as a trademark.  Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 163, 115 S. Ct. 1300, 1303 (1995). The Supreme Court made clear, however, that to be considered a valid trademark, the claimed color must not be functional and must have acquired secondary meaning.  Qualitex, 514 U.S. at 163, 115 S. Ct. at 1303.

(a)  Functionality

"The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead prohibiting legitimate competition by allowing a producer to control a useful product feature."  Qualitex, 514 U.S. at 164, 115 S. Ct. at 1304.  The distinction between functional product features and non-functional product features, however, is not brightly drawn.  Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1203 (11th Cir. 2004). Nonetheless, two tests have developed for determining functionality.  Id.  Under the first test, a product feature is functional if it is essential to the use or purpose of the

11

article or if it affects the cost or quality of the article. Id. Under the second test, a product feature is functional if its exclusive use would put a competitor at a significant non-reputation-related disadvantage.   Id.   When applying the functionality tests, the product is viewed as a whole, so that even if one of the individual elements is functional, the trademark as a whole can still be afforded protection.   Id.

The plaintiff contends that summary judgment is appropriate because there are no genuine issues of material fact regarding the functionality of the color LIGHT BLUE for overgrips.   In support of its claim, the plaintiff presented evidence that Consolidated adopted the LIGHT BLUE color to distinguish TOURNA GRIP overgrips from other overgrips and for no other reason. Moon Aff. ¶¶ 6-7, Ex. 3 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41].   The plaintiff also presented evidence that the color LIGHT BLUE does not affect the performance, cost, or quality of overgrips and signifies nothing about the overgrips other than their source. Id.

The defendants, on the other hand, presented evidence that lighter colors tend to be more absorbent than darker colors, that blue is a popular color for overgrips, and that the color light blue is complimentary to many of the racquet cosmetics

already on the market.  Warren Dep. at 21, 49, Ex. 11 to Defs.'
Statement of Undisputed Material Facts [Doc. No. 72]; Karp Dep.
at 121, Ex. 14 to Defs.' Statement of Undisputed Material Facts
[Doc. No. 72].  The defendants also presented evidence that the
mottled appearance of TOURNA GRIP overgrips makes them
functional.[8]  Boyre Decl. ¶ 19, Ex. 2 to Defs.' Statement of
Undisputed Material Facts [Doc. No. 72].

The court considers the issue of functionality to be a close
question.  Although the defendants have not presented any
evidence stating that consumers prefer to match their racquet
cosmetics to their overgrips, they have presented evidence that
light blue is a very popular overgrip color and that it is
complimentary in color to most racquet cosmetics.  Taking all
inferences in favor of the defendants, a reasonable jury could
conclude that light blue is the natural color to use on
overgrips because it is complimentary to many racquet cosmetics,
because consumers prefer it, and because it is more absorbent
than other shades of blue.  Thus, these facts together create a
genuine issue of material fact as to whether the color LIGHT
BLUE plays an important role in making overgrips more desirable

---

[8] The plaintiff does not seek to protect the mottled
appearance of its TOURNA GRIP overgrip.

to consumers.  See Deere & Co. v. Farmhand, Inc., 560 F. Supp.
85, 98 (D.C. Iowa 1982), aff'd 721 F.2d 253 (8thCir. 1983)
(holding that because farmers prefer to match their loaders to
their tractors, the doctrine of aesthetic functionality barred
John Deere from protecting its unique green color); M—5 Steel
Manufacturing, Inc. v. O'Hagin's, Inc., 61 U.S.P.Q.2d 1086
(T.T.A.B. 2001) (holding that the shape of a roof vent is
functional because the vents blend in or match the roof tiles
with which they are used better than alternative products and
stating, "If a feature asserted as a trademark is the best, or
at least one of a few superior designs for its purpose,
competition is hindered").

    (b)  Secondary Meaning

Both parties have moved for summary judgment on the issue
of whether the plaintiff's LIGHT BLUE trademark has acquired
secondary meaning.  "Secondary meaning is the connection in the
consumer's mind between the mark and the product's producer."
Gift of Learning Foundation, Inc. v. TGC, Inc., 329 F.3d 792,
800 (11th Cir. 2003).  To prove secondary meaning, the plaintiff
must show that, in the minds of the public, the primary
significance of the color LIGHT BLUE is to identify the
plaintiff as the source of the overgrips.  See Inwood

14

Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 851
n.11, 102 S. Ct. 2182, 2187 (1982).  In addition, the plaintiff
must prove that the LIGHT BLUE color acquired this secondary
meaning prior to the date that the defendants began using the
same color or a similar color.  See Gift of Learning, 89 F.3d at
800.

     The parties strongly dispute the date on which the
defendants began using the same or similar color.  The plaintiff
contends that the relevant date is 1998 because the defendants
began selling their PRO TEAM blue overgrip in 1999.   The
defendants, however, claim that the relevant date is 1983.  As
support for this date, the defendants claim that in 1983 they
began selling blue GRIPSY overgrips and that their blue GRIPSY
overgrips are similar in color to the plaintiff's LIGHT BLUE
trademark.  Alternatively, the defendants claim that 1988 is the
relevant date for determining acquired distinctiveness because
that is the date that they began selling blue ORIGINAL VS GRIP
overgrips.

     The court disagrees with the defendants' analysis.  The
GRIPSY overgrip is dark blue.  No reasonable jury could conclude
that it is the same color or similar in color to the plaintiff's
LIGHT BLUE trademark.  Similarly, the defendants' ORIGINAL VS

GRIP overgrip is also not the same color or similar in color to the plaintiff's LIGHT BLUE TOURNA GRIP overgrip.  Thus, neither 1983 nor 1988 are the relevant dates for purposes of determining whether the plaintiff's mark acquired distinctiveness.

The relevant date for determining acquired distinctiveness is 1998 because the defendants began selling their blue PRO TEAM overgrip, which is the subject of this suit, in 1999.  As a result, in order for the plaintiff to succeed on its instant motion for partial summary judgment, the court must find that the plaintiff's LIGHT BLUE TOURNA GRIP overgrips acquired distinctiveness prior to 1999.

Once the relevant date has been determined, the plaintiff has the burden of sustaining a high degree of proof to establish secondary meaning in its color mark.  Cf. Gift of Learning, 89 F.3d at 800 ("The Eleventh Circuit has held that a plaintiff has the burden of sustaining a high degree of proof establishing secondary meaning for a descriptive term.").  The plaintiff, however, argues that the burden in this case should be on the defendants because the plaintiff's LIGHT BLUE color mark is federally registered.  The registration of a mark under Section 2(f) creates a rebuttable presumption that the mark has acquired distinctiveness.  See Aromatique, Inc. v. Gold Seal, Inc., 28

16

F.3d 863, 869 (8th Cir. 1994).  Because the plaintiff's LIGHT
BLUE mark is presumed to have acquired distinctiveness, the
plaintiff argues that the defendant bears the burden of proving
that the mark is invalid.

While the plaintiff's trademark is entitled to a presumption
that it has acquired distinctiveness, the plaintiff is only
entitled to a presumption that its trademark acquired secondary
meaning as of the date that it was registered.  <u>See</u> J. Thomas
McCarthy, M<small>CCARTHY ON</small> T<small>RADEMARKS AND</small> U<small>NFAIR</small> C<small>OMPETITION</small> § 15:34 (4th ed.
2002).  The plaintiff's trademark was registered on February 13,
2001.  The presumption, therefore, does not operate against uses
that began prior to February 13, 2001.  <u>See</u> <u>id.</u>  It is
undisputed that the defendants began selling their PRO TEAM
overgrip in 1999.  Thus, the presumption is inapplicable in this
case, and the burden is on the plaintiff to prove that its color
trademark is valid by a preponderance of the evidence.  <u>See</u>
<u>Aromatique</u>, 28 F.3d at 869.

The Eleventh Circuit has set forth a number of factors the
court must consider when determining whether a trademark has
acquired secondary meaning, including: (1) the length and manner
of its use, (2) the nature and extent of advertising and
promotion, (3) the efforts made by the plaintiff to promote a

conscious connection in the public's mind between the trademark and the plaintiff's business, and (4) the extent to which the public actually identifies the trademark with the plaintiff's goods and services.  See Gift of Learning, 89 F.3d at 800.

In support of its claim that the LIGHT BLUE mark acquired secondary meaning before 1999, the plaintiff introduced a 2002 survey by the United States Racquet and Stringers Association ("USRSA").  Ex. 14 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41].  The USRSA survey asked its members what brand of overgrip they associate with the plaintiff's LIGHT BLUE trademark.  Id.  Approximately 85% of the members questioned associated the plaintiff's LIGHT BLUE trademark with one brand of overgrip.  Id.  87% of those who associated the plaintiff's LIGHT BLUE trademark with one brand of overgrip stated that the name of the brand was TOURNA GRIP.  Id.  Similarly, the plaintiff introduced a 2002 survey by the Georgia Professional Tennis Association wherein 86% of those responding identified TOURNA GRIP as the overgrip that came in a light blue color.[9]

---

[9] The defendants attack these surveys on the grounds that they are not authenticated and that they are inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 583, 589-90, 113 S. Ct. 2786, 2794-95 (1993).

Ex. 15 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41].

As further evidence that its LIGHT BLUE trademark had acquired secondary meaning before 1999, the plaintiff claims that its mark has been intentionally copied by numerous third parties, including the defendants. For instance, the plaintiff introduced evidence that it entered into settlement agreements with Benetton, Wilson, Prince, Volkl, and Alpha Sports that prohibit those companies from using the plaintiff's LIGHT BLUE color on overgrips. Niksich Aff. ¶ 14, Ex. 4 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41]. The plaintiff also presented evidence, which if believed, at least creates an inference that the defendants intended to copy the plaintiff's LIGHT BLUE trademark. Id. at ¶¶ 18-19.

In addition to direct evidence of secondary meaning, the plaintiff also introduced indirect evidence of secondary meaning. For example, the plaintiff produced evidence that it has sold TOURNA GRIP overgrips in its trademarked LIGHT BLUE color continuously since 1977. Moon Aff. ¶ 6, Ex. 3 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41]. The plaintiff also produced evidence that between 1977 and 1998, the plaintiff and its predecessor spent more than $3,500,000

19

advertising their LIGHT BLUE overgrip and sold approximately 50,000,000 units. Niksich Aff. ¶ 10, Ex. 4 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41]. At least some of the plaintiff's advertising and media campaigns featured the color of the plaintiff's overgrips.[10] Moon Aff. ¶¶ 8, 14-15, Ex. 3 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41].

The plaintiff also produced evidence that it utilized professional tennis players, including Pete Sampras, to advertise its LIGHT BLUE TOURNA GRIP overgrips. Ex. 13 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41]. Finally, the plaintiff introduced affidavits from various retailers and one professional tennis player, Luke Jensen, stating that when customers asked for blue tape, they were asking for the plaintiff's TOURNA GRIP overgrip. See, e.g., Queen Decl. ¶¶ 7-8, Ex. 9 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41].

After reviewing the evidence and the parties' briefs, the court concludes that there are genuine issues of material fact remaining on the issue of secondary meaning. The court reaches

---

[10] For instance, some of the plaintiff's print advertisements call TOURNA GRIP "The Original Blue Grip" or "Blue Tape." Id.

this conclusion because it cannot determine as a matter of law that the color LIGHT BLUE primarily acts as an indicator of source.  As noted above, a trademark acquires secondary meaning when the primary significance of the trademark is to identify the trademark owner as the source of the product.  In this case, the defendants have presented evidence showing that numerous third parties have sold blue overgrips for decades.  The fact that numerous third parties sell and have sold blue overgrips for decades indicates that consumers are not likely to associate the color blue with a particular manufacturer.  See Forschner Group, Inc. v. Arrow Trading Co., Inc., 124 F.3d 402, 408 (2d Cir. 1997) (holding that use of the color red on multifunctional pocket knives by three competing companies meant that color red does not primarily designate the plaintiff as the single source of the product);  see also Mana Products, Inc. v. Columbia Cosmetics Manufacturing, Inc., 65 F.3d 1063, 1071 (2d Cir. 1995) (holding that the color black does not identify the plaintiff as the source of the cosmetics because "countless numbers of cosmetics companies . . . sell black compacts.").  While the plaintiff dismisses this evidence as irrelevant because the overgrips sold by these third parties are allegedly dissimilar in shade to the plaintiff's LIGHT BLUE TOURNA GRIP overgrips,

21

the evidence presented by the plaintiff is not sufficient for the court to hold on summary judgment that these other overgrips are all dissimilar in shade to the plaintiff's LIGHT BLUE TOURNA GRIP overgrips, nor is it sufficient for the court to hold as a matter of law that consumers distinguished between various shades of blue used on overgrips before 1999.

The court's conclusion that summary judgment is improper is bolstered by other evidence presented by the defendants. Specifically, the defendants pointed out that the plaintiff licensed the right to use its LIGHT BLUE mark to Head, a third-party competitor.  Head's AGASSI PRO GRIP overgrip is exactly the same shade of blue as the plaintiff's overgrip, and nothing on the package indicates that Head's overgrip originates with the plaintiff.  In addition to the Head license, the plaintiff has continuously sold TOURNA GRIP overgrips in other colors, such as black and gray.  Although sales of non-blue TOURNA GRIP overgrips and Head's LIGHT BLUE overgrips have been small, the plaintiff's decision to license its LIGHT BLUE mark for use on a competing overgrip and to sell TOURNA GRIP overgrips in different colors also creates a genuine issue of material fact as to whether consumers formed an exclusive association between the LIGHT BLUE trademark and the plaintiff before 1999.

Further, while the plaintiff's sales and advertising expenditures have been appreciable, the fact that the plaintiff advertised its TOURNA GRIP overgrip as the "Original Blue Grip" is not particularly persuasive. The advertisement itself implies that numerous other companies are selling blue overgrips. In addition, even assuming that the plaintiff's surveys are admissible, the probative value of the surveys is questionable because they were conducted in 2002 and do not discuss consumers' perceptions prior to 1999.

To summarize, in light of the heavy burden placed on the plaintiff and for the reasons discussed above, the court concludes that there are genuine issues of material fact remaining on the issue of whether the plaintiff's LIGHT BLUE mark has acquired secondary meaning.

B. <u>Fraudulent Procurement of the Plaintiff's Trademark Registration</u>

The defendants seek to cancel the plaintiff's trademark registration, claiming that the plaintiff fraudulently procured its registration. Specifically, the defendants claim that the plaintiff falsely represented to the PTO that its use of the LIGHT BLUE mark on overgrips was substantially exclusive since 1977. The defendants contend that the plaintiff's statement

regarding "substantial exclusivity" of its use of the color LIGHT BLUE was false because at least 13 other tennis companies have sold more than 55 brands of overgrips in various shades of blue.

In response, the plaintiff claims that its statement regarding substantially exclusivity of the use of the color LIGHT BLUE on overgrips was true. In particular, the plaintiff claims that only recently have companies began using colors similar to its LIGHT BLUE color mark on their overgrips. Thus, the plaintiff contends that summary judgment on the defendants' fraudulent procurement claim is appropriate.

"Fraud in procuring a . . . mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application." L.D. Kichler Co. v. Davoil, Inc., 192 F.3d 1349, 1351 (Fed. Cir. 1999) (citing Metro Traffic Control, Inc. v. Shadow Network, Inc., 104 F.3d 336, 340 (Fed. Cir. 1997)). Merely making a false statement is not sufficient to cancel a registration. Id. A party seeking cancellation for fraudulent procurement must prove the alleged fraud by clear and convincing evidence. Id. Because a charge of fraud in the procurement of a trademark registration is a disfavored defense, the party alleging fraud bears a heavy burden of proof. See J.

24

Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:68 (4th ed. 2002).

The requirement that the plaintiff's use be "substantially exclusive" makes an allowance for use by others which may be inconsequential or infringing. See L.D. Kichler Co., 192 F.3d at 1352; see also J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:62 (4th ed. 2002). Inconsequential use or infringing use does not necessarily invalidate an applicant's claim that its use is substantially exclusive. Id. For summary judgment purposes, the court must decide whether there is a genuine issue of material fact regarding whether other companies' use of the color blue on overgrips was inconsequential or infringing.

It is undisputed that numerous companies offered blue overgrips or gauze tape before the plaintiff filed its trademark application. The defendants have offered into evidence examples of several different brands of overgrips offered in various shades of blue. See, e.g., Boyre Decl. ¶ 22, Ex. 2 to Defs.' Statement of Undisputed Material Facts [Doc. No. 72]. Due to the relatively poor quality of the color copies, the court is unable to say with certainty what proportion of the blue

25

overgrips offered into evidence by the defendants are dissimilar to the plaintiff's LIGHT BLUE mark.

Even if others' use of the color LIGHT BLUE was significant enough, however, to cancel a trademark registration for fraud, there must be a showing that the plaintiff knowingly submitted a false declaration with an intent to deceive the PTO.  See Robert B. Vance & Associates, Inc. v. Baronet Corp., 487 F. Supp. 790, 800-01 (N.D. Ga. 1979).  The plaintiffs have submitted an affidavit from their president stating that his statements to the PTO were truthful and made in good faith. Niksich Aff. ¶ 16, Ex. 4 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41].  The only evidence the defendants have offered to rebut Niksich's affidavit is a letter from defendant RMS to Niksich written one month before the plaintiff filed its trademark application.  Ex. 36 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41].  Notably, the letter is a response to a cease and desist letter sent by the plaintiff to RMS.  In the letter, RMS agrees to stop selling overgrips using the same color blue that the plaintiff uses, but then asks the plaintiff for evidence of its trademark rights in the plaintiff's LIGHT BLUE mark.  As grounds for its request, RMS states that two other companies, Modern Aids and Ashaway,

26

allegedly offered overgrips in the same color as the plaintiff's
LIGHT BLUE mark.  While this letter notifies the plaintiff of
two other companies who allegedly sold blue overgrips, it is not
enough to create a genuine issue of material fact as to whether
the plaintiff knew or believed that its statement to the PTO
claiming that its use of the color LIGHT BLUE is substantially
exclusive was false, especially in light of the fact that the
example of the Modern Aids gauze tape provided by the defendants
does not appear to be a similar shade of blue to the plaintiff's
LIGHT BLUE color mark.  Croft Decl. ¶ 3, Ex. 5 to Defs.'
Statement of Undisputed Material Facts [Doc. No. 72].

C.   Laches

The parties move the court for summary judgment on the
defendants' laches argument.  Specifically, the defendants claim
that they first began selling similar blue overgrips in 1983,
and, thus, the plaintiff has waited over twenty years to bring
suit.

Laches may bar claims under the Lanham Act for trade dress
or trademark infringement.  See Kason Industries, Inc. v.
Component Hardware Group, Inc., 120 F.3d 1199, 1203 (11th Cir.
1997).  To succeed on their allegation that this action is

27

barred by laches, the defendants must show: (1) a delay in asserting a right or claim, (2) that the delay was not excusable, and (3) there was undue prejudice to the defendants. See id.  The test for laches is flexible, requiring a careful examination of both the delay and the prejudice caused by that delay.  See Conagra, Inc. v. Singleton, 743 F.2d 1508, 1517 (11th Cir. 1984).

In addressing the delay of a party when a defense of laches is asserted against claims under the Lanham Act, the Eleventh Circuit looks to the four-year statute of limitations contained in the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372, the state statute found to be analogous to the Lanham Act.  See Kason Industries v. Component Hardware Group, 120 F.3d 1199 (11th Cir. 1997).  Delay is to be measured from the time at which the plaintiff knew or should have known that it has a provable claim for infringement.  See Kason, 120 F.3d at 1206.

In this case, the relevant time period for purposes of laches is not the date that the defendants began selling their GRIPSY overgrips or the time that they began selling their ORIGINAL VS GRIP overgrips because those overgrips were not the

same color or similar in color to the plaintiff's LIGHT BLUE
TOURNA GRIP overgrip.  Instead, the relevant time for purposes
of laches is 1999, the time that the defendants began selling
their PRO TEAM overgrips.  In letters dated March 25, 1999, and
April 4, 2000, the plaintiff informed the defendants that their
infringement of the plaintiff's LIGHT BLUE trademark must stop.
When the defendants continued to sell their PRO TEAM overgrips,
the plaintiff filed suit on October 29, 2002.  The plaintiff's
delay in bringing its claims is, therefore, less than four
years.  As a result, the plaintiff's claims are not barred by
laches.

III.    <u>The Defendants' Renewed Motion for Summary Judgment</u>

     The defendants' renewed motion for summary judgment makes
four arguments.  First, the defendants argue that the
plaintiff's LIGHT BLUE trademark has not acquired secondary
meaning.  Next, the defendants argue that even if the
plaintiff's LIGHT BLUE mark has acquired secondary meaning,
there is no likelihood of confusion between the two marks.
Third, the defendants contend that the plaintiff's dilution
claim should be dismissed.  Finally, the defendants argue that
the plaintiff's claims are barred by laches.

29

The court has already discussed the issues of laches and secondary meaning.  Thus, the remaining portion of this order will only address the defendants' arguments regarding likelihood of confusion and dilution.

A.    <u>Likelihood of Confusion</u>

Under § 32(a) of the Lanham Act, liability for trademark infringement occurs when a person "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114.  Thus, to prevail on a trademark infringement claim the plaintiff must demonstrate that (1) its mark has priority, (2) the defendants used their mark in commerce, and (3) the defendants' mark is likely to cause consumer confusion.  <u>See Frehling Enterprises, Inc. v. International Select Group, Inc.</u>, 192 F.3d 1330, 1335 (11th Cir. 1999).

The defendants argue that even if the plaintiff can prove that its LIGHT BLUE overgrips are nonfunctional and that they have acquired secondary meaning, the plaintiff still cannot show that there is any likelihood of confusion.  Likelihood of confusion requires the fact finder to evaluate a number of

elements, including: (1) the strength of the plaintiff's trademark, (2) similarity of the parties' marks, (3) the similarity of the products, (4) the similarity of the outlets and purchasers, (5) the defendants' intent, and (6) actual confusion. AmBrit v. Kraft, Inc., 812 F.2d 1531, 1538 (11th Cir. 1986).

1.   The Strength of the Plaintiff's Mark

The first factor the court must consider is the strength of the plaintiff's LIGHT BLUE mark. The more the public recognizes the plaintiff's mark, the more protection it deserves and will receive. See Frehling Enterprises, 192 F.3d at 1335 (11th Cir. 1999). Similarly, the "less that third parties use [the] mark, the stronger it is, and the more protection it deserves." Id. at 1336.

The defendants argue that the plaintiff's LIGHT BLUE mark is very weak. They point out that numerous companies offer and have offered blue overgrips similar to the plaintiff's LIGHT BLUE trademark for decades. The defendants also note that the plaintiff has licensed the right to use the plaintiff's LIGHT BLUE mark to Head, further eroding the strength of the LIGHT BLUE mark.

31

The plaintiff, on the other hand, argues that its LIGHT BLUE mark is strong.  The plaintiff contends that it has engaged in a protracted advertising campaign designed to raise public awareness of its LIGHT BLUE mark.  According to the plaintiff, its advertising campaign, along with the use of its LIGHT BLUE overgrips by tennis stars such as Pete Sampras, has resulted in consumers associating the LIGHT BLUE mark with the plaintiff's overgrips.

The court has already concluded that there are genuine issues of material fact regarding whether the plaintiff's mark has acquired secondary meaning.  Nevertheless, viewing the evidence in the light most favorable to the plaintiff, the court concludes that a reasonable jury could find that this factor favors the plaintiff.

2.   The Similarity of the Trademarks

The second factor the court must consider to ascertain likelihood of confusion is the similarity of the parties' marks. To determine the similarity of the marks, the court considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used.  Frehling Enterprises, 192 F.3d at 1337.

32

The defendants argue that the marks are not similar because their PRO TEAM overgrip is a different shade of blue than the plaintiff's LIGHT BLUE TOURNA GRIP overgrip and because the BABOLAT and the PRO TEAM trademarks appear on the defendants' PRO TEAM overgrips.  In addition, the defendants point out that the parties use different colored finishing tapes.  For example, the defendants sell their PRO TEAM overgrip with black finishing tape, while the plaintiff sells its TOURNA GRIP overgrip with red finishing tape.

While the use by the defendants of their house mark and a different colored finishing tape tends to reduce the similarities between the trademarks, the two marks are still very similar in color.  Thus, the court concludes that a reasonable jury could find that this factor favors the plaintiff.

### 3.   The Similarity of the Products and Purchasers

The third factor the court must consider is the competitive proximity of the parties' products, as well as the similarity of the purchasers and the retail outlets in which the products are sold.  The greater the similarity between the products and purchasers, the greater the likelihood of confusion.  See John

H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 976 (11th Cir. 1983).

In this case, the products, purchasers, and retail outlets appear to be nearly identical.  In fact, the defendants admit that they designed their PRO TEAM overgrip to function similarly to and to compete against the plaintiff's overgrip.  These factors, therefore, also favor the plaintiff.

4.   The Defendants' Intent

Next, the court must look at the defendants' subjective intent in adopting their blue PRO TEAM overgrip.  If it can be shown that the defendants adopted the plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to find that there is confusing similarity.  Frehling Enterprises, Inc., 192 F.3d at 1340.

While the defendants admit that they intended to copy the functional aspects of the plaintiff's TOURNA GRIP overgrip, they have presented evidence that they did not intend to the copy the plaintiff's LIGHT BLUE trademark and that the manufacturer proposed the particular color of their PRO TEAM overgrip.  Boyre

34

Dep. at 79, 237-38, Ex. 2 to Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts [Doc. No. 49].

The plaintiff, on the other hand, contends that the evidence indicates that the defendants patterned their PRO TEAM overgrip after the plaintiff's TOURNA GRIP overgrip.  For instance, the defendants first attempted to purchase the right to privately label the plaintiff's LIGHT BLUE overgrip.  Niksich Decl. ¶ 18, Ex. 4 to Pl.'s Statement of Undisputed Material Facts [Doc. No. 41].  When the plaintiff refused to sell this right, the defendants came out with a blue overgrip virtually identical to the plaintiff's trademark.  See id. (stating that the plaintiff refused to license its LIGHT BLUE mark to Babolat).

Again, viewing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that this factor also favors the plaintiff.

5.   Actual Confusion

The final factor the court must consider in determining whether a likelihood of confusion exists is evidence of actual confusion.  The defendants argue that the parties' products have been directly competitive for nearly six years and yet neither side has uncovered a single instance of actual confusion.

35

Although the fact that no confusion has yet occurred does weigh in favor of granting the defendants' motion for summary judgment, evidence of actual confusion is not necessary to a finding of likelihood of confusion.  <u>E. Remy Martin & Co. v. Shaw-Ross International Imports, Inc.</u>, 756 F.2d 1525, 1529 (11th Cir. 1985).

     6.   <u>Results of Likelihood of Confusion Test</u>

     Based on the evidence before the court, the court cannot find as a matter of law that there is no likelihood of confusion between the parties' trademarks because a reasonable jury could find that six of the seven likelihood of confusion factors favor the plaintiff.  Accordingly, summary judgment is not proper on the plaintiff's trademark infringement claim.

B.   <u>Dilution</u>

     The plaintiff has asserted a claim for trademark dilution under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c) ("FTDA").  To prove an FTDA claim, the plaintiff must provide sufficient evidence that: (1) its LIGHT BLUE mark is famous, (2) the defendants adopted their blue PRO TEAM trademark after the plaintiff's LIGHT BLUE trademark became famous, (3) the defendants diluted the plaintiff's LIGHT BLUE trademark, and (4)

36

the defendants' use of their blue PRO TEAM mark is commercial and in commerce.   15 U.S.C. § 1125(c).   The parties dispute whether the plaintiff's LIGHT BLUE trademark is famous enough to warrant protection under the statute, and whether the defendants' use dilutes the distinctive qualities of the plaintiff's LIGHT BLUE trademark.

1.   <u>Whether the Plaintiff's LIGHT BLUE Trademark is Famous</u>

As noted above, the FTDA only protects famous trademarks. "To warrant protection from dilution, a trademark must be especially famous and distinctive." <u>Michael C. Caruso & Co., Inc. v. Estefan Enterprises</u>, 994 F. Supp. 1454, 1463 (S.D. Fla. 1998), <u>aff'd</u> 166 F.3d 353 (11th Cir. 1998).   As examples of dilution of famous marks, the House Judiciary Committee stated that "use of DUPONT shoes, BUICK aspirin, and KODAK pianos would be actionable" under the FTDA.   <u>Id.</u> (citing H.R. Rep. No. 374 (1995)).

Although it is not entirely clear, it appears to the court that the plaintiff is arguing that its mark is famous only within the tennis market.   Pl.'s Mem. of Law in Opp'n to the Defs.' Mot. for Summ. J. at 30 [Doc. No. 50] ("Because Plaintiff's mark is famous within its niche, this also favors a finding of dilution.")   Even assuming that the plaintiff's LIGHT

BLUE mark is famous within the tennis market, this does not necessarily make the plaintiff's LIGHT BLUE mark famous for purposes of the FTDA.  The Eleventh Circuit has not squarely addressed whether fame in a particular market is sufficient for an FTDA claim, and there is no apparent consensus among the courts that have addressed it.[11]  The Eleventh Circuit did, however, affirm the Southern District of Florida's decision in Michael C. Caruso, 994 F. Supp. at 1463, aff'd 166 F.3d at 353. In Caruso, the Southern District of Florida held that BONGO was not famous for purposes of the FTDA.  Although the Caruso court did not explicitly reject the concept of niche-market fame, the court stated that "while BONGO may be a distinctive mark in the junior women's apparel market, it is not a generally famous mark like 'Exxon' or 'Kodak.'"  Michael C. Caruso, 994 F. Supp. at 1463.  Thus, there is some indication that the Eleventh Circuit would reject the concept of niche-market fame.

---

[11] For instance, the Ninth Circuit in Thane International, Inc. v. Trek Bicycle Co., 305 F.3d 894, 908 (9th Cir. 2002), and the Third Circuit in Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC, 212 F.3d 157, 164-65 (3d Cir. 2000), held that the FTDA protects a mark famous within a niche market only when the alleged diluter uses the mark within that niche.  In contrast, the District of Minnesota in Ott v. Target Corporation, 153 F. Supp.2d 1055, 1075-76 (D. Minn. 2001), held that the niche-market theory is inconsistent with the purposes of trademark dilution law.

There are other reasons for declining to extend the FTDA to trademarks that are only famous within a niche market.  When Congress created the FTDA, it "greatly expanded the scope of protection available to owners of famous trademarks." <u>Voice-Tel Enterprises, Inc. v. Joba, Inc.</u>, 258 F. Supp.2d 1353, 1363 (N.D. Ga. 2003).  For example, the FTDA allows an owner of a famous trademark to prevent subsequent use of its mark regardless of the presence or absence of competition or confusion.  <u>Id.</u>  It is, therefore, "'the most potent form of trademark protection' and has the [most] potential of 'over-protecting trademarks.'" <u>Thane International, Inc. v. Trek Bicycle Co.</u>, 305 F.3d 894, 908 (9th Cir. 2002).  Because of the potential for overreaching, the legislative history of the FTDA shows that Congress intended fame in the dilution context to be construed very narrowly.  <u>See Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC</u>, 212 F.3d 157, 171 (3d Cir. 2000) (Barry, J. dissenting).  Extending FTDA protection to trademarks that are famous only in a niche market would grant a trademark owner far more protection than the FTDA intended.  <u>See Ott v. Target Corp.</u>, 153 F. Supp.2d 1055, 1075-76 (D. Minn. 2001) ("[A]pplication of the niche-market theory would result in an over-extension of the protection afforded by the FTDA and would render trademark

39

infringement laws duplicative."). As a result, absent Eleventh Circuit authority adopting the concept of niche-market fame, the court is unwilling to extend the scope of the FTDA to trademarks that are famous solely within a niche market.[12]

   2.   Whether the Defendants' Use of Their Blue PRO TEAM
        Overgrip Dilutes the Plaintiff's LIGHT BLUE mark

Assuming arguendo that the plaintiff's LIGHT BLUE mark is famous for purposes of the FTDA, the next question is whether the plaintiff has presented evidence of actual dilution. See Moseley v. Victoria's Secret Catalogue, Inc., 537 U.S. 418, 433, 123 S. Ct. 1115, 1124 (2003) (holding that actual dilution, as opposed to a mere likelihood of dilution, is an essential element of an FTDA claim). The defendants argue that the plaintiff's dilution claim must fail because the plaintiff has not introduced any direct evidence that its LIGHT BLUE mark has been diluted.

The plaintiff admittedly has not presented any direct evidence of actual dilution. Rather, the plaintiff argues that

_____

   [12] Even if the court were to adopt the concept of niche-market fame, it does not necessarily follow that the plaintiff's mark is famous. The plaintiff's LIGHT BLUE mark is not inherently distinctive. Further, as noted above, the court has already indicated that there are genuine issues of material fact remaining as to whether the plaintiff's LIGHT BLUE mark has acquired secondary meaning.

40

evidence of the similarity between the two marks and the defendants' intent in adopting their blue PRO TEAM overgrip is sufficient to sustain the plaintiff's dilution claim.   As support for its argument, the plaintiff cites to <u>Nike, Inc. v. Variety Wholesalers, Inc.</u>, 274 F. Supp.2d 1352, 1372 (S.D. Ga. 2003).   The <u>Nike</u> court held that Variety diluted Nike's trademarks because the Variety trademarks were identical or virtually identical to Nike's trademarks.   <u>Id.</u>

Unlike the <u>Nike</u> case, the defendants' blue PRO TEAM overgrip is not identical or virtually identical to the plaintiff's LIGHT BLUE mark.   <u>Cf</u>. <u>Savin Corp. v. The Savin Group</u>, 391 F.3d 439, 453 (2d Cir. 2004) ("[A] mere similarity in the marks – even a close similarity – will not suffice to establish per se evidence of actual dilution.").   The defendants' PRO TEAM overgrip is very similar in color to the plaintiff's LIGHT BLUE TOURNA GRIP overgrip.   However, the BABOLAT and the PRO TEAM trademarks appear on the defendants' PRO TEAM overgrips.   In addition, the parties use different colored finishing tapes.   Thus, the <u>Nike</u> decision is inapposite here.

While it is true that evidence of lost sales and profits does not necessarily need to be proved, the plaintiff must

introduce some evidence of the lessening of the capacity of its
LIGHT BLUE mark to identify and distinguish its overgrips.
Moseley, 537 U.S. at 434, 123 S. Ct. at 1125 ("Whatever
difficulties of proof may be entailed, they are not an
acceptable reason for dispensing with proof of an essential
element of a statutory violation."). Because the parties' marks
are not identical and the plaintiff has not presented any other
evidence of actual dilution, the court concludes that there is
no genuine issue of material fact on actual harm to support the
plaintiff's dilution claim. Thus, the defendants are entitled
to summary judgment on the plaintiff's dilution claim.

<u>Conclusion</u>

For the foregoing reasons, the court hereby:

(1)   GRANTS IN PART and DENIES IN PART the plaintiff's
      renewed motion for partial summary judgment [Doc. No.
      73].  The motion is granted to the extent that the
      plaintiff seeks summary judgment on the issues of
      fraudulent procurement and laches.  The plaintiff's
      motion is otherwise denied;

(2)   GRANTS IN PART and DENIES IN PART the defendants'
      renewed motion for summary judgment [Doc. No. 72].

The motion is granted to the extent that the defendants seek summary judgment on the plaintiff's dilution claim. The motion is otherwise denied;

(3) In summary, the court concludes that there are material issues of fact remaining regarding the functionality of the plaintiff's LIGHT BLUE trademark, whether the plaintiff's LIGHT BLUE trademark acquired secondary meaning prior to 1999, and whether there is a likelihood of confusion between the plaintiff's LIGHT BLUE TOURNA GRIP overgrip and the defendants' blue PRO TEAM overgrip; and

(4) DIRECTS the parties to file a proposed consolidated pre-trial order pursuant to Local Rule 16.4 within 30 days of entry of this order.

SO ORDERED, this 30th day of November, 2005.

/s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL, JR.
United States District Judge

43